UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI
CASE NO. 11-CR-20587-SCOLA

UNITED STATES OF AMERICA

V.

SANDRA HUARTE                    /

**MS. HUARTE'S CORRECTED MOTION FOR
COMPASSIONATE RELEASE FROM FCI COLEMAN LOW
AND MOTION FOR EXPEDITED BRIEFING AND REVIEW**

Pursuant to 18 U.S.C. § 3582(c)(1)(A), Defendant, SANDRA HUARTE, moves the Court for compassionate release and states[1]:

**PRELIMINARY STATEMENT**

Ms. Huarte is serving her sentence at FCI Coleman – Low, which is part of Coleman Federal Correctional Complex. In May 2020, Coleman told Ms. Huarte she would be released to home confinement—a relief to her and her family, given the rapid spread of COVID in the prisons. She completed the paperwork and was waiting to hear back from the Coleman's administration. But she was never released, never heard back, and now, on July 14, 2020, her sons' fears have come true: their mother has tested positive for COVID19. Ms. Huarte has lost taste and smell, and on July 16, 2020, she was taken to radiology to examine her lungs. Per the Center for Disease Control, Ms. Huarte, who is 55, obese, and suffers from acute upper respiratory in-

---

[1] As required by the Local Rules, we undersigned conferred with counsel for the government, AUSA, Michael Davis. He opposes this motion.

fection, faces greater risk of death from COVID-related complications. Given the situation at Coleman, her medical condition, and the existence of a stable release plan, Ms. Huarte, through undersigned *pro bono* counsel, respectfully submits that there are "extraordinary and compelling reasons" to grant her motion for compassionate release pursuant to U.S.S.G. § 1B1.13 and 18 U.S.C. § 3582(c)(1)(A)

I.      RELEVANT FACTS

On April 10, 2013, Ms. Huarte was sentenced to a total of 262 months for conspiracy to: commit health care fraud; give and receive kickbacks; and commit money laundering. DE1282. She had no prior convictions. PSI at 38. Ms. Huarte has remained in custody since her arrest on September 6, 2011. PSI at 2. According to the BOP Inmate Locator, her projected release date is April 15, 2030, which reflects BOP's calculation of her sentence with full good time at approximately 223 months. She has currently served 107 months, which means she has served about 48% of her sentence.

Ms. Huarte is obese. She is 5'7" (PSI ¶ 189) and her most recent weight, taken January 9, 2020, was 198 pounds (Ex. 1 at 2). Per the Department of Health & Human Services, her BMI is 31, which is defined as obese.[2] Additionally, as of January 24, 2020, she was diagnosed with a severe form of pneumonia (Ex. 1 at 1), which is called Legionnaires' Disease.[3] As of May 31, 2020, she was suffering from an acute upper

---

[2] BMI Calculator available at https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last accessed July 16, 2020).
[3] Explaining the legionella bacterium causes Legionnaires' disease at https://www.mayoclinic.org/diseases-conditions/legionnaires-disease/symptoms-causes/syc-20351747#:~:text=Legionnaires'%20disease%20is%20a%20severe,bacteria%20from%20water%20or%20soil. (last accessed July 16, 2020).

respiratory infection, unspecified. Ex. 1 at 3. Finally, on July 14, 2020, she informed her sons that Coleman told her she tested positive for COVID-19. She reports having lost her senses of smell and taste, and that the prison sent her for a radiological exam of her lungs.

The virus is spreading at FCC Coleman, which is a group of four facilities that form the Coleman Federal Correctional Complex. As of July 20, 2020, Coleman Low has reported 89 infections, with the other three buildings reporting 164 infections, and 1 death.[4] The numbers have continued to climb, while conflicting information is being released about the safety of the facility and containment of the virus. On the one hand, BOP has released a statement that it has increased cleaning and testing.[5] But according to Jose Rojas, the Southeastern Regional Prison Union Vice President, the reality is "much worse." *Id.* Regarding the numbers, one news station reported on its probing of BOP's reported infection numbers:

> According to the BOP website, the numbers provided to the public only detail "open cases" of confirmed lab results, not cases that are both open and closed. The BOP declined to provide us with those numbers.

*Id.* Since March, the same local news channel has been requesting interviews with the Warden and access to enter and view FCC Coleman, all of which have been denied. *Id.*

Given that social distancing is not possible, the virus spread is only going to increase. On July 15, 2020, Ms. Huarte was housed with 60 women, who are also

---

[4] https://www.bop.gov/coronavirus/ (visited July 18, 2020).
[5] https://www.baynews9.com/fl/tampa/watchdog/2020/07/17/skyrocketing-covid-19-cases-at-coleman-prison (visited July 18, 2020).

COVID positive and have varying degrees of symptoms, but during July 16-17, 2020, 20 more COVID positive and symptomatic women were added to their group. Social distancing is not possible.

Truly appalling is the report that sick, symptomatic women, who are pending test results, are being housed in what was the Coleman visiting room.[6] There are no beds; they are sleeping on the floor. There are no bathrooms or showers; portable ones have been placed outside for these sick women to use.

Where Ms. Huarte is housed, there is no unit counselor to provide legal forms like BP9s, and, relying on Coleman's statement to her that she would be released to home confinement, she delayed applying for compassionate release. This statement that she was on a list for release to home confinement was made by her then-counselor, Counselor McGregor. A request for compassionate release was formally submitted on July 16, 2020. Ex. 2. In that request, she reiterated that she had been told in May that she would be released to home confinement, at some point that changed, and around July 14, she tested positive. *Id*. She reiterated her high risk factors, her lack of disciplinary history, and her stable release plan, to live with her husband in his residence, which has a room and bathroom she could use exclusively to safely quarantine. *Id*. The prison responded, "Your concerns are noted." *Id*.

---

[6]https://www.miamiherald.com/news/local/community/miami-dade/article244236662.html

4

## II. THE COURT IS AUTHORIZED TO GRANT COMPASSIONATE RELEASE.

Congress amended 18 U.S.C. § 3582(c)(1)(A) in the First Step Act of 2018, to address BOP's failure to bring individuals eligible for compassionate release to the courts' attention.[7] The amendment was explicitly intended to expand—and expedite—federal compassionate release, and to allow courts to grant relief even when BOP finds release inappropriate.[8] In relevant part, the compassionate release statute now states:

> (c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case--
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> > (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . .

---

[7] *See* Pub. L. No. 226-391, § 603, 132 Stat. 5194, 5238-40 (2018).
[8] *See* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Sen. Cardin, co-sponsor of First Step Act) ("The bill expands compassionate release . . . and expedites compassionate release applications."); *U.S. v. Haney*, __F.3d__, 2020 WL 1821988, at *1, *3 (S.D.N.Y. Apr. 13, 2020) (noting First Step Act amended § 3582(c)(1)(A) to permit inmate to seek compassionate release in federal court, ensuring "the right to a meaningful and prompt judicial determination of whether he should be released").

5

18 U.S.C. § 3582 (2020). Thus, the statutory requirements for sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with applicable policy statements. *Id.*

The policy statements issued by the Sentencing Commission, however, were last revised before the First Step Act. Courts have therefore found that, because "the U.S. Sentencing Commission guidance has not yet been updated to reflect the liberalization of the procedural requirements" in the First Step Act of 2018,[9] "[t]here is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act." *U.S. v. Beck*, __ F. Supp. 3d __, 2019 WL 2716505, *6 (M.D.N.C. June 28, 2019); *see also U.S. v. Mondaca*, 2020 WL 1029024, at *3 (S.D. Cal. Mar. 3, 2020) ("A growing number of district courts have concluded the Commission lacks an applicable policy statement regarding when a judge can grant compassionate release . . . because the Commission never harmonized its policy statement with the FSA."). Thus, "the Court may independently evaluate whether [petitioner] has raised an extraordinary and compelling reason for compassionate release." *U.S. v. Lisi*, 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020).[10]

---

[9] *See U.S. v. Gagne*, 2020 WL 1640152, *2 (D. Conn. Apr. 2, 2020), appeal pending, No. 20-1169 (2d Cir.).
[10] *See also U.S. v. Redd*, 2020 WL 1248493, *6 (E.D. Va. Mar. 16, 2020) (§ 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants, and therefore "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'); *U.S. v. Bradshaw*, 2019 WL 7605447, *3 (M.D.N.C. Sept. 12, 2019)

This Court should excuse exhaustion in this case:

> Exhaustion is not required where "resort[ing] to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action. Such prejudice may result, for example, from an unreasonable or indefinite timeframe for administrative action." *McCarthy*, 503 U.S. at 146-47. Here, because of the unprecedented pandemic combined with [defendant's] high risk of severe illness or death due to her advanced age and severe medical conditions, resorting to the administrative remedy may occasion undue prejudice.

*U.S. v. Lima,* Case No. 16-20088 (S.D. Fla. May 11, 2020) (Scola, J.) (excusing exhaustion and citing *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992), and *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) ("Even where exhaustion is seemingly mandated by statute…, the requirement is not absolute.")). Other courts in our district have followed suit with the *Lima* court and excused exhaustion, where defendants have medical conditions that place them at high-risk for severe or fatal COVID-19 complications. *See, e.g., U.S. v. Minor,* 18-80152 (S.D. Fla. Apr. 17, 2020) (Middlebrooks, J.).

Here, Coleman told Ms. Huarte in May that she would be released to home confinement. At some point, Coleman changed its mind and then placed her in a unit where she does not have access to a counselor who would provide a BP9, the form on which the compassionate requests are to be written. Given her medically recognized

---

(noting that "there is no policy statement applicable to a defendant's motion for compassionate release which constrains the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under §3582(c)(1)(A)(i)"); *U.S. v. Fox*, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("[T]he Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive.").

7

risk factors, which are discussed in more depth below, as well as Coleman's actions and inactions, this Court should excuse exhaustion.

Additionally, requiring Ms. Huarte to wait until August 16, 2020, is futile. In 2019, BOP received 1,735 applications and allowed the judiciary to look at just 55—just 3%. *See* Ex. 3. Indeed, the BOP Director denied more than half of the requests it received even among cases that had already been approved by facility wardens. *Id.* at 2. Last year, despite the Office of the Inspector General reports,[11] the Sentencing Commission's amendment,[12] and direct prodding from senators,[13] BOP ap-

---

[11] *See, e.g.,* Dept. of Just., Office of the Inspector General, *The Fed. Bur. of Prisons Compassionate Release Program*, at ii (Apr. 2013), https://bit.ly/2xfKomH. The report found there were no checks on wardens' ability to deny requests: "BOP does not conduct any systematic reviews of decisions made by Wardens or Regional Directors to ensure that they are consistent with each other and with the BOP's Program Statement and the underlying statutory authority." *Id.* at iii. *See also,* Dept. of Just., Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at iii (May 2015), https://bit.ly/39YFBTU ("Aging inmates could be viable candidates for early release, resulting in significant cost savings; but BOP policy strictly limits those who can be considered and, as a result, few have been released.").

[12] After the OIG failed to spur change, the Sentencing Commission tried its hand. It started where the OIG left off, noting BOP's "lengthy review" of applications was slow, produced abysmally "low approval rates," and the BOP "ignores the often precipitous decline in health or circumstances [that] can occur after imprisonment." U.S.S.G. § 1B1.13, amend 799 (Nov. 1, 2016), https://bit.ly/39WniyO. To loosen BOP's grip, the Commission broke down "extraordinary and compelling" reasons into four discrete categories: *medical condition of the defendant*, *age of the defendant*, *family circumstances*, and in a clear attempt to broaden releases, a catch-all category—*other reasons*. But nothing changed.

[13] Letter from Sen. Brian Schatz et al. to Dr. Thomas Kane, Dir. Bur. of Prisons (Aug. 3, 2017), https://bit.ly/39XFGHo.

proved *zero* releases in the elderly-medical category (of 204 applications), *zero* releases under the caregiver category (of 120 applications), and despite the broad catch-all, precisely *zero* in the other-reasons category (of 330 applications).[14]

### III. MS. HUARTE'S COVID-19 DIAGNOSIS, COMBINED WITH HER PRE-EXISTING MEDICAL CONDITION OF OBESITY, CONSTITUTE EXTRAORDINARY AND COMPELLING REASONS TO RELEASE HER.

As a result of her age and pre-existing medical condition, Ms. Huarte is a higher risk of severe illness or death from the COVID-19 that she contracted at Coleman. That risk is neither hypothetical nor exaggerated. In the past few months, 95 inmates have died in BOP custody as a result of COVID-19, and the death toll continues to rise daily.

On July 14, 2020, Ms. Huarte learned she tested positive for COVID-19. Her symptoms thus far include the loss of her senses of smell and taste. She recently suffered a severe form of pneumonia, called Legionnaires' disease, and she is still diagnosed by BOP as suffering from an acute upper respiratory infection, unspecified. Ex. 1 at 3. A radiological examination of her lungs was conducted on July 16, 2020. She and her family are terrified about her ability to care for herself and overcome this deadly disease while in Coleman custody.

Ms. Huarte is at increased risk, as identified by the CDC, for likelihood of death based on her comorbidity of obesity and her age. Regarding her age, the CDC explains: "Age is a strong risk factor for severe illness, complications, and death.

---

[14] February 13, 2020, letter from BOP to House Judiciary Committee reporting on reductions of sentences, available at page 43 of https://www.nacdl.org/getattachment/1b1de364-b6c3-4904-92b1-43992a6c89fa/ca9-defenders-amicus-in-millage.pdf.

9

…Early U.S. epidemiologic data suggests that the case fatality [was] <u>1%–3% for ages 55–64 years….</u>".[15] In addition to age, the first peer-reviewed, large-scale study of American COVID-19 hospital patients confirmed that people with obesity are at greater risk for serious COVID-19 complications.[16] Among hospitalized patients, 41% were obese. *Id*. The CDC agrees that individuals with obesity are at a "higher risk of serious illness," from COVID-19.[17] The CDC further explains that obesity is having a BMI of 30 or greater. *Id*.

> Obesity is a state of chronic, low-grade systemic inflammation, which may predispose patients to the "cytokine storm" characteristic of severe Covid-19. In addition, adipose tissue may serve as a reservoir for SARS-CoV-2 owing to its high levels of expression of angiotensin-converting enzyme 2, perpetuating spread to other organs. Furthermore, obesity may be a common denominator of associated coexisting conditions and underlying socioeconomic factors linked to worse outcomes from Covid-19.[18]

Recognizing the guidance from the scientific community about how obesity places individuals at greater risk from COVID-19, many courts have granted compassionate

---

[15] https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (emphasis added) (last accessed May 14, 2020).
[16] Safiya Richardson, Jamie S. Hirsch, Mangala Narasimhan, et al, "Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area," *Journal of American Medical Ass'n*, (Apr. 22, 2020), available at https://jamanetwork.com/journals/jama/fullarticle/2765184.
[17] Centers for Disease Control, "People Who Are at Higher Risk for Severe Illness," available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.
[18] Matthew J. Belanger, M.D., et al., *COVID-19 and Disparities in Nutrition and Obesity*, New England Journal of Medicine (July 15, 2020) (available at https://www.nejm.org/doi/full/10.1056/NEJMp2021264) (visited July 16, 2020).

release based on obesity as an extraordinary and compelling reason. *See, e.g., U.S. v. Handy*, 3:10-cr-00128-RNC-8,2020 WL 2487371 (D. Conn. May 14, 2020).[19]

In addition to her age and obesity, preliminary data suggests that racial and ethnic minorities are especially vulnerable to COVID-19 complications, including death.[20] Thus, Ms. Huarte's age and obesity, combined with her COVID positive infection, and influenced by preliminary data about the impact COVID has on minorities, create extraordinary and compelling reasons to grant her compassionate release.

Finally, Ms. Huarte's COVID-19 positive presents an extraordinary and compelling reason to grant her compassionate release. "Most people in the higher risk categories" who contract COVID-19 "will require more advanced support: positive

---

[19] Many other courts have granted compassionate release using obesity as a ground. *See, e.g., U.S. v. Barber*, 6:18-cr-00446-AA,2020 WL 2404679 (D.Or. May12, 2020); *U.S. v. Hunt*, 2:18-cr-20037-DPH-DRG, 2020 WL 2395222 (E.D. Mich. May 12,2020); *U.S. v. Ullings*,1:10-cr-00406-MLB-1,2020WL 2394096 (N.D. Ga. May 12, 2020); *U.S. v. Foreman*, 3:19-cr-00062-VAB-1, 2020 WL 2315908 (D. Conn. May11, 2020); *U.S. v. Jenkins*, 99-cr-00439-JLK-1, 2020 WL 2466911 (D.Co. May 8, 2020); *U.S. v. Quintero*, 6:08-cr-06007-DGL-1,2020 WL 2175171 (W.D. N.Y. May 6, 2020); *U.S. v. Howard*, 4:15-cr-00018-BR-2, 2020WL 2200855 (E.D.N.C. May 6, 2020); *U.S. v. Lacy*, 3:15-cr-30038-SEM-TSH-1,2020 WL 2093363(C.D.Ill. May 1, 2020); *U.S. v. Ardila*, 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D.Conn. May 1, 2020); *U.S. v. Delgado*, 3:18-cr-00017-VAB,2020 WL 2464685 (D. Conn.Apr.30, 2020);*U.S. v. Dillard*, 1:15-cr-170-SAB, Dkt. No. 71 (D. Idaho Apr. 27,2020);*U.S. v. Joling*, 6:15-cr-00113-AA-1, 2020 WL 1903280 (D.Or. Apr. 17,2020); *U.S. v. Trent*, 3:16-cr-00178-CRB-1,2020 WL 1812242 (N.D. Cal. Apr.9, 2020); *U.S. v. Zukerman*, 1:16-cr-00194-AT-1,2020 WL 1659880 (S.D. N.Y. Apr. 3,2020).

[20] Centers for Disease Control, COVID-19 in Racial and Ethnic Minority Groups, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (noting disproportionate death and hospitalization rates for black Americans); Letter from Sen. Klobuchar & Sen. Durbin, among others, to BOP Dir. Carvajal (Apr. 28, 2020), available at https://bit.ly/2YQGb4a (asking BOP to provide ethnicity and racial data in "light of preliminary data collected from the general public that has shown COVID-19's disproportionate impact on certain populations, including racial and ethnic minorities").

pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation. Such care requires highly specialized equipment in limited supply, as well as an entire team of care providers, including but not limited to 1:1 or 1:2 nurse to patient ratios, respiratory therapists and intensive care physicians." Ex. 4 at ¶ 6 (Declaration of Dr. Jonathan Louis Golob). "For high risk patients who do not die from COVID-19, a prolonged recovery is expected to be required, including the need for extensive rehabilitation for profound deconditioning, loss of digits, neurological damage, and loss of respiratory capacity." *Id.* ¶ 4.[21] Thus, if the disease follows this trajectory for Ms. Huarte, she would be rendered unable to independently function within the prison.[22]

---

[21] *See also* Ling Mao, et al., Neurologic Manifestations of Hospitalized Patients With Coronavirus Disease 2019 in Wuhan, China, *JAMA Neurol.*, (Apr. 10, 2020); https://jamanetwork.com/journals/jamaneurology/fullarticle/2764549.

[22] Indeed, even if her current bout with COVID-19 resolves, Ms. Huarte will not be out of the woods. The WHO has concluded that there is "currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from second infection." World Health Organization, *"Immunity Passports" in the context of COVID-19* (Apr. 24, 2020), *available* https://www.who.int/newsroom/commentaries/detail/immunity-passports-in-the-context-of-covid-19. The Centers for Disease Control says the same: "The immune response to COVID-19 is not yet understood. Patients with MERS-CoV infection are unlikely to be re-infected shortly after they recover, but it is not yet known whether similar immune protection will be observed for patients with COVID-19." Centers for Disease Control, Coronavirus Disease 2019, *available* https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html. And even in those who develop an immune response, at least with other coronaviruses, "immunity seems to wane quickly." Antonio Regalado, *What if immunity to covid-19 doesn't last?*, MIT Tech. Rev. (Apr. 27, 2020), *available* https://www.technologyreview.com/2020/04/27/1000569/ how-long-are-peopleimmune-to-covid-19/. Because we have only six months of experience with COVID-19, "little is known yet about the body's immune response to an infection. . . . 'That's something that's going to take a while to figure out.'" said George Rutherford, the head of infectious disease and global epidemiology at the University of California San Francisco. Kristen V. Brown, *Coronavirus Survivors Hope for Immunity—The Reality is More Complicated*, Bloomberg (Apr. 14, 2020) https://www.bloomberg.com/news/articles/2020-04-14/do-coronavirus-survivorshave-immunity-from-reinfection-maybe.

Using the framework of the Sentencing Guidelines, this means that even if Ms. Huarte survives the illness, her ability to "provide self-care" within her prison environment is likely to now be "substantially diminished." U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I). These are "extraordinary and compelling" reasons for release. *Id.*

Indeed, as one court recently concluded, "[n]o rationale is more compelling or extraordinary." *U.S. v. Foster*, No. 1:14-cr-324-02, ECF No. 191, at 10 (M.D. Pa. Apr. 3, 2020). And just last week, in *U.S. v. Jorge Vazquez Torres*, 19-cr-20342-BLOOM, ECF No. 58, (S.D. Fla. July 10, 2020) the Court granted compassionate release to a defendant positive for COVID-19, because he was not receiving adequate medical care in the BOP, because his release would limit the spread of COVID-19 in the prison, and because home confinement would allow for adequate treatment.

As another district court recently explained in granting compassionate release to a COVID-19 positive defendant, "The risk is simply too great that the BOP will fail to detect a decline in [defendant's] condition and, if his condition suddenly becomes even more emergent than it currently is, that the BOP will fail to provide him the specialized care he needs. The court will not play Russian roulette with [the defendant's] life." *U.S. v. McCall,* No. 2:18CR95-MHT, ___ F.Supp.3d ___, 2020 WL 2992197, at *2 (M.D. Ala. June 4, 2020) (granting compassionate release after an evidentiary hearing with testimony from two BOP physicians and an outside medical expert to defendant with sickle cell disease, finding that BOP medical staff "has taken very little action, and continues to fail to take critical action, to treat [defendant's]

13

life-threatening condition," and that "contrary to the diagnosis of the BOP medical staff . . . he should be hospitalized *now*").

Nor will Ms. Huarte's release present a risk of spreading infection to the community. Each BOP facility has a protocol for release after positive test for COVID-19. These protocols are typically developed in conjunction with the local health departments. The Court can thus condition her release on Ms. Huarte and her husband meeting that protocol. Doing so decreases, rather than increases, the risk to the community. *See U.S. v. Arreola-Bretado*, No. 3:19-CR-03410-BTM, ___F.Supp.3d ___, 2020 WL 2535049 (S.D. Cal. May 15, 2020) (granting compassionate release to COVID-19 positive defendant after concluding she will receive superior medical care out of custody, and further finding that returning defendant to her family is safer to the community than keeping her confined, where she will likely be a risk to other inmates and staff who have not yet contracted COVID-19).

Indeed, in addition to the local case of *United States v. Vazques Torres,* supra, numerous courts nationwide have recently granted compassionate release to COVID-19 positive defendants on these and similar grounds. *See, e.g.*, *U.S. v. Huntley*, No. 13-cr-119-ABJ, ECF No. 263, at 8 n.9, 10 (D.D.C. May 5, 2020) (ordering compassionate release for defendant who tested positive for COVID-19 while motion was being litigated); *U.S. v. Jacobs*, No. 19-cr-149, ECF No. 84 (S.D. Ia. July 2, 2020) (defendant tested positive and has been treated with "Tylenol and sequestration," continues to

14

test positive a month later, and is granted 3582 sentence reduction while still held at county jail).[23]

Thus, this Court would not be alone in granting compassionate release to a COVID-positive inmate like Ms. Huarte, and her release can be done consistently with the health and safety of our entire community.

## IV. MS. HUARTE'S RELEASE IS CONSISTENT WITH 18 U.S.C. 3553(a).

Compassionate release in this case is consistent with a sentence that is sufficient but not greater than necessary. First, Ms. Huarte has served over eight years in prison, the equivalent of 48% of her sentence. This is not an insignificant term of imprisonment for a woman, who is now 55 years old and, prior to her arrest in this case, had no interaction with law enforcement or the legal system.

---

[23] *See also, U.S. v. Plank*, No. 17-cr-20026, at *5-6 (D. Kan. July 2, 2020) (noting "despite the BOP's measures" over "one-third of the population has been infected" at Forrest City, and finds that despite being COVID-19 positive, "the risk to defendant remains, as it has not been established that a person becomes completely immune to the virus after infection"); *U.S. v. Barber,* 18-cr-00446-AA, ECF No. 55 (D. Or. May 12, 2020) (granting compassionate release to defendant with diabetes, hypertension, and obesity, explaining that "not only has defendant shown that he is particularly vulnerable to complications from COVID-19, he has also tested positive for the illness," and that he has not been able to manage his diabetes "as well as he could in a non-custodial environment"); *U.S. v. Fischman*, 16-cr-00246-HSG-1, ECF No. 76 (N.D. Cal. May 1, 2020) (granting compassionate release from Terminal Island to COVID-19 positive defendant); *U.S. v. Heyward*, No. 17-cr-527, ECF No. 83 (D. Md. June 30, 2020) (releasing inmate with hepatitis C, hypertension, who tested positive and "has since recovered from the virus" and noting that government does not dispute that "secondary contraction of COVID-19 is possible"); *U.S. v. Kriglstein*, 1:16-cr-00663-JCH-1, ECF No. 60 (D.N.M. Apr. 27, 2020) (staying for 5 days release of defendant who was tested for COVID-19 as condition of order granting compassionate release, with positive result); *see also Yeury J.S. v. Decker*, Case No. 2:20-cv-5071-KM, ECF No. 20 (D.N.J. May 11, 2020) (ordering release for COVID-19 positive immigration detainee).

15

Second, her release will pose no danger to the community. As mentioned, Ms. Huarte is now 55 years old. The Sentencing Commission has observed that:

> Studies have repeatedly shown older offenders to have a lower risk of reoffending and the Commission's study confirmed this finding . . . For each age group studied, the older the age group, the lower the rearrest rate. The same trend holds true for both reconviction and reincarceration rates.

U.S. Sent'g Comm'n, Recidivism & Federal Sentencing Policy Recidivism of Federal Offenders: A Comprehensive Overview, Report at a Glance (Mar. 2016), available at go.usa.gov/xNkNM. Therefore, statistically, Ms. Huarte's risk of recidivism is low. Her family reports that, while in prison, Ms. Huarte has completed over 1800 hours of correctional and educational programing, including that she earned her G.E.D., an English course, computer skills training, and other vocational courses and programming. She will also, of course, begin her term of supervised release upon release, during which time she will be monitored by a U.S. Probation officer, and subject to modifications and revocation should she be unable to comply with the terms of supervision.

Third, she enjoys strong family support. Her husband and children remain close and supportive, prepared to do everything Ms. Huarte needs. She will have a stable home, with family willing to provide attentive medical care for her, including all rehabilitation that may be needed. They have the financial wherewithal to support her in a way that only a loving family can, which will ensure her success on supervision. Fourth, the Court may impose additional conditions of supervised release, such

16

as home confinement, if it considers it necessary. *See, e.g., U.S. v. Raia,* No. 2:18-CR-657, Dkt. No. 91 (D.N.J. May 7, 2020).

## V.   CONCLUSION

At the time Ms. Huarte was sentenced, this Court could not have contemplated a pandemic like the one ripping through the BOP and the whole world. Where Coleman said it would release her to home confinement, reversed course, and then ultimately, Ms. Huarte has contracted this deadly disease—deadlier to her because of her increased risk factors of age and obesity—this Court is authorized by Congress to act and grant compassionate release.

WHEREFORE, the defendant Sandra Huarte, through undersigned pro bono counsel, respectfully requests this Court GRANT her motion for compassionate release; or in the alternative, GRANT her request for an expedited briefing schedule of seven days for the government to file its response, and three days for Ms. Huarte to file her reply.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on July 20, 2020 a true and correct copy of the foregoing has been furnished electronically via CMCEF to AUSA Michael Davis.

Respectfully submitted,

**BELL ROSQUETE REYES ESTEBAN, PLLC.**
999 Ponce De Leon Blvd.
Suite 1120 - Penthouse
Coral Gables, Florida 33134
Telephone:   (305) 570-1610
Direct Line: (305) 570-1576
Cellular:       (305) 781-8111
Facsimile:    (305) 570-1599
Email:          hbell@brresq.com


By:          s/ henry p. bell
         HENRY P. BELL
         Fla. Bar No. 0090689